ATLANTIC COAST LINE RAILROAD COMPANY *v.* WHARTON *et al.,* RAILROAD COMMISSIONERS OF THE STATE OF SOUTH CAROLINA.

ERROR TO THE SUPREME COURT OF THE STATE OF SOUTH CAROLINA.

No. 36.    Argued November 5, 1907.—Decided December 9, 1907.

Any exercise of state authority, whether made directly or through the instrumentality of a commission, which directly regulates interstate commerce is repugnant to the commerce clause of the Federal Constitution; and so held as to the stopping of interstate trains at stations within the State already adequately supplied with transportation facilities.

Whether an order stopping interstate trains at specified stations is a direct regulation of interstate commerce depends on the local facilities at those stations, and while the sufficiency of such facilities is not in itself a Federal question, it may be considered by this court for the purpose of determining whether the order does or does not regulate interstate commerce, and if, as in this case, the local facilities are adequate, the order is void.

Inability of fast interstate trains to make schedule, loss of patronage and compensation for carrying the mails, and the inability of such trains to pay expenses if additional stops are required are all matters to be considered in determining whether adequate facilities have been furnished to the stations at which the company is ordered by state authorities to stop such trains.

74 S. Car. 80, reversed.

THE railroad company, plaintiff in error, brings the case here to review a judgment of the Supreme Court of the State of

South Carolina, which granted a mandamus to compel the company to stop certain of its through trains running between Jersey City, New Jersey, and Tampa, Florida, at a station on its road called Latta, in the State of South Carolina, near the boundary line between that State and the State of North Carolina.

Upon a request filed with him by the Railroad Commission of South Carolina, the Attorney General of that State commenced these proceedings by filing a petition to obtain a mandamus directed to the company compelling it to stop trains 32 and 35 at the station mentioned, pursuant to the order made by the Railroad Commission, after a hearing had been had before it.

The company demurred to the petition, the demurrer was overruled and the company given leave to answer, which it did, setting up several defenses, among others averring that sufficient accommodations were already furnished to the citizens of Latta, and those residing along the Latta Branch Railroad; that the trains mentioned, 32 and 35, were interstate commerce trains, running between New York and Tampa, Florida, and intermediate cities, and the southbound trains were compelled to run at a high rate of speed in order to make connections with the steamers to Havana from Tampa, and so as to make the through trip as fast as possible; that the northbound trains were companion or return trains, making an equally fast schedule time; that to stop them at stations like Latta would result in rendering it impossible for them to make schedule time and they would have to be abandoned as through fast trains; that they carried the United States mail and their trains were made up very largely of through passengers; that there were two competitors for this through travel, and that it would be impossible to keep up the trains in competition with these other railroads if stops were to be made other than those absolutely necessary. The answer also averred that in addition to a number of passenger trains of local character daily, there was also furnished the citizens of Latta the con-

venience of a daily passenger train each way for through travel north and south other than trains 32 and 35, and it was averred that the order of the Railroad Commission of South Carolina was unreasonable and unnecessary, a direct burden upon interstate commerce, and therefore a violation of and in conflict with § 8 of Art. I of the Constitution of the United States, giving Congress the power to regulate commerce.

On the coming in of this answer an order was made referring all issues involved to a referee to take testimony thereon and report back as soon as convenient. Pursuant to such order evidence was taken before a referee and report made thereon to the Supreme Court, which decided that sufficient accommodations were not furnished to the citizens of Latta and along the Latta Branch Railroad by the plaintiff in error at its station in Latta; and the court thereupon made an order that the passenger trains 32 and 35 should stop when flagged at the Latta station, for the purpose of receiving and delivering passengers at that station, "with the alternative right on your part to provide facilities substantially the same as those which would be afforded the citizens of Latta by stopping trains Nos. 32 and 35 on flag."

The testimony upon which this order was made is in the record and is substantially uncontradicted. It appears from that testimony that Latta is a small station in the State of South Carolina, near the northern boundary of the State, and on the road of the plaintiff in error, having a population, according to the last United States Census, of 453. Clio is another small settlement in the same State, about twenty miles northwest of Latta, on what is termed the Latta Branch Railroad, having a population of 508, by the same census. Dunbar is a station between Latta and Clio, with a population according to the same census, of 115. The country back of these stations is said to be a somewhat thickly settled agricultural country. It is also said by witnesses for Latta that these places have increased somewhat in population since the last census.

In addition to several local trains passing through Latta

for stations along this road, or to and from Clio, there was one daily through train each way (Nos. 39 and 40), stopping at this station, and which carried passengers through to New York or Florida and intermediate stations, and they were equipped with first and second class cars, through Pullman sleepers, mail, express and baggage cars. The only objection to them was their want of speed; that they stopped so frequently they did not arrive at their destination as swiftly as trains 32 and 35. In addition, trains 32 and 35 could be boarded at Florence, a station on the same road, distant about 15 or 20 miles south from Latta, or at Dillon, a station about 7 miles from Latta. The objection made by the people of Latta to this mode of getting these trains was that if they were going north they rode south from Latta to Florence, and then boarded the train and went directly back over the same road from Florence to Latta, which they would not have to do if the train stopped at Latta. It also involved an additional cost of $1.42 above the price of a ticket from Latta to New York. If they preferred to take the train northbound at Dillon instead of Florence, then they had to drive from Latta to Dillon over what was described by a witness to be in winter "one of the worst roads that ever was made a road." It was also averred that by stopping the southbound train (No. 35) at Latta it could be there taken at 3 o'clock in the morning instead of going to Florence the night before and taking the train there at 4 o'clock A. M. the next day, and a close connection could also be made at Florence with Columbia (on a branch road), by taking train 35 at Latta at 3 A. M., so that a citizen could go to Columbia and return to Latta the same day, thus saving a hotel bill, which now had to be paid, as connections were so made that the journey could not be accomplished in one day. The people at Clio, and the other stations on the Latta Branch Railroad, were accommodated so that they could ride to Latta in time to have substantially the same conveniences in getting away from that station that the people living there had. The distance from Jersey City to Tampa is about twelve hundred miles, and the trains

32 and 35 are among the fastest and longest continuous trains in the whole country, exceeding the distance from New York to Chicago. These trains rank with the very best trains run anywhere. They are placed on the road for the convenience of through travel, and could not be profitably run if they were slower trains.

*Mr. P. A. Willcox* and *Mr. Frederic D. McKenney,* with whom *Mr. Alexander Hamilton, Mr. George B. Elliott, Mr. F. L. Willcox* and *Mr. Henry E. Davis* were on the brief, for plaintiff in error:

The State has no power or authority to interfere in other than police matters with fast mail and passenger trains engaged wholly in interstate commerce. *Henderson* v. *Mayor of New York,* 92 U. S. 259; *Hannibal &c. R. R. Co.* v. *Husen,* 95 U. S. 465; *Leisy* v. *Hardin,* 135 U. S. 100; *Walling* v. *Michigan,* 116 U. S. 446; *Robbins* v. *Shelby County,* 120 U. S. 489.

Even if adequate local railroad facilities are not furnished, a State has no power and authority to compel the furnishing of such facilities by requiring fast mail and passenger trains engaged wholly in interstate commerce to make the stops, but it can only compel additional local trains to be furnished. *Tiernan* v. *Rinker,* 102 U. S. 123; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196; *Wabash Railroad Co.* v. *Illinois,* 118 U. S. 557; *State Freight Tax Case,* 15 Wall. 232; *Welton* v. *Missouri,* 91 U. S. 275; *Brown* v. *Houston,* 114 U. S. 622; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Mississippi Railroad Commission* v. *Illinois Central Railroad Co.,* 203 U. S. 335; *Hall* v. *DeCuir,* 95 U. S. 485. See also *Crandal* v. *Nevada,* 6 Wall. 35; *Hannibal &c. R. Co.* v. *Husen,* 95 U. S. 465; *Mobile County* v. *Kimball,* 102 U. S. 691; *Webber* v. *Virginia,* 103 U. S. 344; *Walling* v. *Michigan,* 116 U. S. 446; *Pickard* v. *Pullman Southern Car Co.,* 117 U. S. 23; *Wabash Railroad Co.* v. *Illinois,* 118 U. S. 557; *Robbins* v. *Shelby Taxing District,* 120 U. S. 489; *Bowman* v. *Chicago & Northwestern Railroad Co.,* 125 U. S. 465; *Covington & Cincinnati Bridge Co.*

v. *Kentucky,* 154 U. S. 204; *United States* v. *E. C. Knight Co.,* 156 U. S. 1.

The facilities provided were adequate and it would be un-reasonable to require the company to convert these two fast interstate trains into local trains and to compel plaintiff in error to stop these two trains at Latta.

*Mr. M. C. Woods,* with whom *Mr. J. Fraser Lyon,* Attorney General of the State of South Carolina, was on the brief, for defendants in error:

The regulation of the accommodations afforded the traveling public is a police regulation. *Gladson* v. *Minnesota,* 193 U. S. 53; *Mississippi R. R. Commission* v. *Illinois Central R. R. Co.,* 203 U. S. 335.

The Supreme Court of South Carolina was warranted in deducing from the holdings of this court that the primary duty of even an interstate railroad is to its local territory, and the secondary duty is to interstate traffic. *Mississippi R. R. Commission* v. *Illinois Central R. R. Co.,* 203 U. S. 335; *Lake Shore Co.* v. *Ohio,* 173 U. S. 285; *C. C. C. & St. L. R. R. Co.* v. *Illinois,* 177 U. S. 514. *Illinois Central R. R.* v. *Illinois,* 163 U. S. 142, discussed and distinguished.

The fact at issue having been determined by a tribunal of competent jurisdiction from which no appeal was taken, the Supreme Court of South Carolina would have been warranted in granting a peremptory writ of mandamus, as prayed for in the complaint, this being one of the instances in which this court has held that state authority may stop interstate trains.

The Supreme Court of South Carolina having granted to the railroad company the alternative of providing facilities substantially the same as those which would result from the stopping of trains 32 and 35 at Latta, the fault is with the plaintiff in error for failure to avail itself of this privilege, and there-fore there has been no burden, direct or indirect, placed, by the court's action, upon interstate commerce.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

The questions of the validity of state statutes and orders of state railroad commissions, directing the stoppage of through interstate trains, have frequently, within late years, been before this court. The last case is that of *Mississippi Railroad Commission* v. *Illinois Central Railroad Company*, 203 U. S. 335, where the prior cases are referred to. See also *Atlantic Coast &c.* v. *North Carolina Commission*, 206 U. S. 1.

That any exercise of state authority, in whatever form manifested, which directly regulates interstate commerce, is repugnant to the commerce clause of the Constitution is obvious. It hence arises that any command of a State, whether made directly or through the instrumentality of a railroad commission which orders, or the necessary effect of which is to order, the stopping of an interstate train at a named station or stations, if it directly regulates interstate commerce, is void.

It has been decided, however, that some orders which may cause the stoppage of interstate trains made by state authority may be valid if they do not directly regulate such commerce. *Lake Shore & M. S. R. Co.* v. *Ohio*, 173 U. S. 285. When, therefore, an order made under state authority to stop an interstate train is assailed because of its repugnancy to the interstate commerce clause, the question whether such order is void as a direct regulation of such commerce may be tested by considering the nature of the order, the character of the interstate commerce train to which it applies, and its necessary and direct effect upon the operation of such train. But the effect of the order as a direct regulation of interstate commerce may also be tested by considering the adequacy of the local facilities existing at the station or stations at which the interstate commerce train has been commanded to stop. True, inherently considered, whether there be adequate local facilities is not a Federal question, but in so far as the existence of such adequate local facilities is involved in the determination of the Federal

question of whether the order concerning an interstate train does or does not directly regulate interstate commerce, that question for such purpose is open and may be considered by us. 203 U. S., *supra.*

Without stopping to consider whether, in view of the character of the trains to which the order before us related, it would not result that the order complained of was a direct regulation of interstate commerce, and testing the subject by the local facilities at the station at which the trains were ordered to stop, we think the railroad company in this case has furnished such reasonable accommodations to the people at Latta as it can be fairly and properly called upon to give, and the order to stop these trains is, therefore, not a valid one.

The term "adequate or reasonable facilities" is not in its nature capable of exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded, regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost. In this case the company furnishes eleven different trains a day by which the people of Latta can leave that place, and among them are the daily through trains 39 and 40 for the South and North, respectively. That the inhabitants of a place demand greater facilities than they have is not at all conclusive as to the reasonableness of their demand for something more. Fault is found here with the character of some of the local trains, in that the appointments thereof are not up to a sufficiently high standard. It is true that included in these eleven trains were some which were a combination of freight and passenger, and others which only ran between Latta and Clio, and those are described as dirty and without proper closets and drinking tanks. These deficiencies are remediable by other means than the stoppage of the two trains in question. It is to be remembered that these two places, Latta and Clio, had together a population, by the

last census, of about a thousand. Two ordinary modern trains of the usual passenger coaches would comfortably transport the total population of these places. The number of people who are inconvenienced by the non-stoppage of these trains is, of course, comparatively quite small. One witness, who was in the hotel and general merchandise business at Latta, said that he sent a man or two every week to meet the fast train at Dillon, because they could not take it at Latta. Other witnesses said that the demand for those particular trains, 32 and 35, was quite frequent, as many as four people a week, while others said that the inconvenience of the through trains, 39 and 40, was on account of their not being fast trains, and hence were not so pleasant as the others, 32 and 35, and did not get them in to their destination as early as the latter trains did. The demand at Latta by people desiring to go to the termination of the road, either at New York or Tampa, would naturally be small. Some of the plaintiff's witnesses said that the demand for transportation at Latta was large, or quite large, and the inconvenience great, but a further examination of these witnesses showed that in specific details there was much lacking, and instances of inconvenience were really somewhat limited. But assuming that the number actually inconvenienced by the want of fast trains was "*quite large*," as said by some witnesses, it is perfectly evident the number would be small compared with the inconvenience of the much larger number of through passengers resulting from the stoppage of these trains at Latta and other similar stations in the State.

To stop these trains at Latta, and other stations like it, which could bring equally strong reasons for the stoppage of the trains at their stations, would wholly change the character of the trains, rendering them no better in regard to speed than the other trains, 39 and 40, and would result in the inability of what had been fast trains to make their schedule time, and a consequent loss of patronage, also the loss of compensation for carrying the mails, which would be withdrawn from them, and the end would be the withdrawal of the trains, because of

their inability to pay expenses.   All these are matters entitled to consideration when the question of convenience and adequate facilities arises.  There is no contradiction in the testimony that the company desires, so far as is fairly possible, to pay as much attention to the local demands as to the "through" claims.

Of course, it is not reasonable to suppose that the same facilities can be given to places of very small population that are supplied to their neighbors who live in much larger communities, and the defendants in error, it may be conceded, make no such demand.  No one would assert that one daily train each way between New York and Philadelphia would furnish adequate facilities for the transportation of passengers.  Twenty times that number of trains would be necessary, and yet one through train a day, each way, through so small a place as Latta to New York or Tampa would in all probability easily transport all the passengers desiring transportation between these places.  Nevertheless, the fair needs of the locality for transportation to other local points must be considered and provided for.  This, as we think, has been done.

Taking all the circumstances into consideration, as shown by uncontradicted evidence, we are of opinion that the judgment of the Supreme Court, directing a mandamus, was erroneous, and it is therefore reversed, and the case remanded to the Supreme Court of South Carolina for further proceedings therein not inconsistent with this opinion.

*Reversed.*